Mr. Justice Wylie
delivered the opinion of the court:
The cause was heard at the special term in equity on general demurrer of the defendants to complainant’s bill. The demurrer was allowed in that court, and the bill dismissed. From that decree the cause has come here on complainant’s appeal. Previously to filing the demurrer, the defendants had put in an answer, to which no replication had been filed by the complainant. Having elected to make their defense by way of answer, it was too late for the defendants to demur *384 except by agreement of counsel. After this, other counsel having appeared for defendants, such an agreement was entered into by counsel for their respective clients and was filed in the cause. Thus the cause came on to be heard upon the demurrer to the bill, without regard to the answer or to any other proceedings which had taken place of an interlocutory character. The court was thus not at liberty to know that any answer had been filed, or that any facts connected with the case existed, except only such as appear upon the face of the bill itself, including its exhibits.
While a demurrer lies only for defects which are patent on the face of the bill, and is bad if it assert matters of fact outside of the bill, it is equally clear, on the other hand, that if the case made by the bill itself be insufficient to entitle the complainant to the relief he seeks, he cannot be allowed to fortify the case so made by invoking aid to his bill from matters of fact which do not appear upon its face. Story’s Eq Pl., sec. 433 et seq.
These are fundamental principles of pleading by which every court is bound, and which generally they endeavor to observe. It is to be assumed, therefore, that, in deciding the issue in the present case, this court will know nothing except the facts properly stated in the bill itself or its exhibits. To that rule we propose, on this occasion, strictly to adhere.
The subject of controversy in the present case is an award of $197,190, made by the commissioners under the twelfth article of the treaty of 1871 between the United States and Great Britain. That award was not signed by the American commissioner, for reasons of which we are not informed. It is in the following words:
“Augustine R. McDonald) “ vs. > Nos. 42 and 334. “The United States. )
“ We award the sum of one hundred and ninety-seven thousand one hundred and ninety dollars, to be paid in gold by the Government of the United States to the Government of Her Britannic Majesty in respect of the above claim.
“L. CORTI,
“RUSSEL GURNEY,
“ Commissioners.”
*385 McDonald was a subject of Great Britain, who claimed, before the commission, that, in the early part of the year 1864, he obtained a permit from the Treasury Department, and a letter from the President, with which he proceeded to the States of Arkansas and Louisiana, where he purchased a large quantity of cotton, which was subsequently destroyed by troops of the United States while engaged in belligerent operations. At the time he obtained his license, as he claimed it to be, it was lawful for the President to authorize licenses to trade with the enemy in special cases, under regulations prescribed by the Secretary of the Treasury. Subsequently to the purchase of his cotton, the act of Congress of July 2, 1864,was passed, which forbade the granting of such licenses, and revoked those which had theretofore been issued; and in February, 1865, the cotton was said to have been destroyed. McDonald claimed that he had made his purchases under a license from the United States in May and June, 1864; that the act of Congress of 2d July revoked his license, in consequence of which he was unable to remove his cotton, and its destruction took place in February, 1865. And this was the foundation of his claim before the commissioners. After the claim had been allowed by the commissioners, and the money was yet in the Treasury of the United States, but ready to be paid over to the British government, as required by the treaty, the bill in the present suit was filed, by which the complainant asked this court to compel McDonald to execute an assignment to complainant of the money so awarded to be paid to the British government in respect of the claim, and for an injunction to restrain McDonald from receiving the money.
The complainant claims that the fund belongs to him by reason of certain proceedings in bankruptcy in the southern district of Ohio, which took place in 1868 and 1869, under which McDonald was discharged as a bankrupt on his own petition, and all his property passed to the complainant as assignee, including the right to the fund here in controversy. It may be conceded that, so far as the claim in question could be affected by the laws of this country, it did pass to the assignee in bankruptcy, according to the principles affirmed in Comegys vs. Vasse, 1 Pet., 193. That was a case which arose *386 under the treaty of 22d of February, 1819, with Great Britain. The commissioners in that case had made an award in favor of the assignee in bankruptcy, and the money was paid to. him. Vasse, the bankrupt, brought an action to recover this, money from the assignee, on the ground that the claim had not passed under the bankrupt assignment; but the court held that it it was such right or claim as could and did pass, under that assignment. Both parties were citizens of this country, and the money had actually been received by one of them.
An abstract of the proceedings in McDonald’s bankruptcy is attached to the bill as an exhibit. These show that, on the 17th of March, 1869, the applicant, McDonald, received his. final discharge. It also shows that, on the day immediately preceding, on the application of the assignee, McDonald was examined under oath as to the nature and condition of his. property, and that this examination was reduced to writing and filed in the proceedings. The complainant has not supplied us with a copy of this paper. Had it shown any want of truth, or contained false representations calculated to mislead his creditors as to the character and value of the claims in.question, doutless it would have been set forth. The bill itself, however, charges nothing of the kind in regard to that examination.
On the 17th of March, 1869, then, the bankrupt was finally discharged, free of his old debts, and entitled to all his future acquisitions.
About six months subsequent to the bankrupt’s discharge,, the assignee, (this complainant,) under authority from the court, sold the amounts, judgments, &c., late the property of the bankrupt, to William White, one of the defendants in this suit, for the sum of §20. The bill in this case does not affect to deny that McDonald’s claim against the United States on account of the destruction of the cotton in question, constituted a part of the subjects thus sold.
But it asserts that the cotton-claim did not pass under that sale for several other reasons: First, because White, in fact, made the purchase on behalf of McDonald, and with McDonald’s money; but there is nothing, we think, in that objection.. McDonald had received his final discharge six months pre *387 viously to the sale, and had he thought proper, or found it convenient, might have been the purchaser in his own name.
The third reason set out in the bill against the validity of that sale to White is because, in his application before the commissioners under the treaty, McDonald made no mention of the fact that such a sale had taken place as by the rules of the commission it was his duty to make known in such case.
But if the sale to White was for McDonald’s use, then it might well be said that no transfer had been made. The claim was still McDonald’s under a fair purchase, although for a time it had belonged to his assignee in bankruptcy.
But suppose the sale was made to White for his own use; how could the concealment by McDonald of that fact from the commissioners invest the assignee with any title 1 His title was already gone by the sale.
The third objection to the validity of the sale made by the assignee is that, in the schedule of his assets, McDonald describes one only of his claims as being against the United States, but the other is described as being a claim “ against General 'Osborne, of the United States Army, and others, for burning, in January and February, 1865, from one thousand to two thousand bales of my cotton in Arkansas and Louisi*ana.” (This claim, by an amended schedule, was subsequently enlarged to seven thousand or eight thousand bales, and marked “ worthless.”) It is not charged in the bill that the error in stating that the claim was against General Osborne and others, and not against the United States, was committed with any design of fraud on the part of McDonald, but that it was calculated to mislead as to its value — a claim against the Government being of greater value than one of the same character against an individual, or, at any rate, that it was not a correct description.
But in that matter the act of General Osborne was the act of the Government, which was responsible for his conduct, and this was known, so that it was substantially a statement that the claim was one against the Government.
Besides this, the bankrupt proceedings, which are referred to as an exhibit, show that on the very day preceding the bankrupt’s discharge, he was examined under oath as to the con *388 dition of his property, when an opportunity was afforded to the assignee and creditors to obtain all the information they could desire as to the value and character of this claim; and this information was probably obtained, but the complainant has neglected to annex it as an exhibit to his bill.
Another objection made to the way in which McDonald described his claim in the schedule is that it contains no reference to the license under, which McDonald claimed to have purchased the cotton, and which was essential to the validity of any such claim against the Government.
But this objection appears to be quite as groundless as either of the others. If it be necessary that the bankrupt should not only specify the amount and character of his claim and the party against whom it exists, as he did in the present instance, but also state the evidence and other muniments to sustain it, probably no schedule in proper form has ever been filed in any bankrupt court.
The mere assertion of a claim on account of cotton destroyed by an invading force in the enemy’s country amounts in itself to an implication that the claimant relied upon the protection of a Government license in its purchase, otherwise the claim would be preposterous on its face. Having, therefore, asserted a claim at all against the United States in his schedule, he asserted a claim which all men knew could be* good only under a license.
But in none of these respects, or any other respects, does the bill make a charge of any fraudulent purpose on the part of McDonald.
We are now‘brought to the point at which it is charged that the claim, as enlarged in the amended schedule, was marked by McDonald “ worthless.” If the claim, at the time, was, indeed, known by McDonald to be of considerable value, or if he had reason to believe that it was valuable, or acted upon such belief, then this case would have fallen within the ruling in Clark vs. Clark, 17 How., 315.
But at best the claim at that time was but a mere possibility of value. As against the United States directly, McDonald could assert no claim. He was a subject of Great Britain, and as such could claim the interposition of his government on his behalf. There was a possibility of a treaty, *389 but in making treaties private interests are often sacrificed for political considerations. A treaty might be made some time in the future or might not. If made, the period might be remote ; and, whenever made, it might contain no provision for his case.
Under these circumstances, McDonald might fairly have set down his claim as “ worthless.”
I propose now to go further, and to show from the face of this bill and its exhibits that the claim in question was utterly without foundation or value at the date of the proceedings in bankruptcy, and that White, who bought it for twenty dollars, paid more than it was worth.
By the laws of war, property found in the enemy’s country is liable to destruction by the invading force without regard to whether it belong to enemy, neutral, or friend. Its location makes it all enemy property, and if it in fact be property oí a neutral, he will have no right to compensation for his loss.
Foreigners who reside in the enemy’s country in time of war must share the inconveniences of its citizens. The law upon this subject was clearly stated by Mr. Marcy, when Secretary of State, in answer to a demand made by the French government upon the United States for indemnity on account of losses sustained by French citizens from the bombardment of Grey town by a naval force of the United States, as follows:
“ No power assailing an enemy’s country is required to discriminate between the subjects of that country and foreigners domiciled therein, nor can the latter with any better right than the former, claim indemnity in any case except from the country under whose jurisdiction they have placed themselves.” °
Nevertheless a license to trade with the enemy may be granted by a belligerent State to its own subjects, to neutrals, or even to subjects of the enemy, and operates as a dispensation with the laws of war so far as its terms may fairly be construed to extend, but being a high act of sovereignty, it is necessarily stricti juris, and must not be carried further than a clear construction of its terms will permit. See Lawrence’s Wheaton, 690, 691.
The leading case on this subject is that of the Hope, which was an American vessel, laden with corn and flour, captured *390 while proceeding from the United States to a port in Spain occupied by British troops, under a license granted by the British consul at Boston, accompanied by a letter of approval from the admiral on the Halifax station. Sir William Scott pronounced judgment condemning the vessel as lawful prize, on the ground that neither of these officers possessed authority from the government to grant a license to the ship to trade with the enemy.
By the act of Congress of 13bh July, 1861, the President was authorized, in his discretion, to grant licenses to trade with the inhabitants of the insurrectionary States; and such intercourse, so far as by him licensed, should be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury.
In pursuance of the authority conferred by this law, rules and regulations were issued by the Secretary of the Treasury at different times and promulgated by order of the President. Such as are appropriate to the facts of this case, as stated in the bill, will be referred to presently. All these several series of regulations are expressly made exhibits to this bill, and are, therefore, proper to be considered on this demurrer. The complainant was bound to state in his bill the authority under which McDonald proceeded to the enemy’s country for purposes of trade, and to show that the license was in all respects such as the law of Congress permitted, otherwise the bill itself shows that he acted without license, and that his claim was without-foundation.
The bill does state that he had a letter from the President recommending him to the protection of the officers of the army. It also states that he received a promise of protection and necessary permits from the Treasury Department. But neither the letter nor the permits, are set Out in the bill or any of the exhibits, nor does it pretend to state their substance, nor even that the permit was signed by the Secretary, or signed by any one. What constituted a necessary permit was such a permit as the law authorized, and the bill affords us no light as to the character of McDonald’s permit, except the expression of an opinion on his part that it was such a permit as he needed for his purposes. Had the permit been exhibited or its substantial contents stated in the *391 bill, perhaps we might have differed from this complainant as to its character. At all events, we have a right to know something more on this subject than We find in this bill. The rule is that the bill should state the right, title, or claim of the complainant with accuracy and clearness. See Story’s Eq. Pl., sec. 241. In the case of Dainese vs. Hale, decided by the Supreme Court of the United States at the present term, Mr. Justice Strong, in pronouncing the opinion, says : “ One who seeks to shelter himself from personal liability for an alleged tort on the ground that the act complained of was committed by him in the exercise of consular jurisdiction, must set forth the laws, usages, &c., which authorized that jurisdiction.”
Iu the present case, the value of McDonald’s claim, if any, depended upon his license. The act of Congress alone could make the license lawful. No permit granted by any officer of the Government, the Army, or Navy, could relieve him or exempt his property from the liabilities of an enemy, except such as was issued strictly in pursuance of the law.
By the act of Congress of 13th July, 1.861, the President was vested with discretionary authority to prescribe in what cases, and on what terms, a partial intercourse might be permitted with the States then in rebellion. In pursuance of this authority, he directed the Secretary of the Treasury to prescribe the regulations which were issued by that officer on the 4th March, 1862. These regulations were still in force at the date when McDonald claims that he obtained a letter from the President and a permit from the Treasury Department to go into the Southern States for the purpose of buying cotton, and were expressly made subject to future modification or revocation.
The first of these regulations declared that “All licenses shall be issued by the Secretary of the Treasury, and all applications therefor must be made in writing to him, stating specifically the purpose for which the license is desired, and if for general or special trade, setting forth the character and aggregate valué of the merchandise to be transported to the destination thereof, and the proposed route of transportation; and also the character of the merchandise, if any, desired in exchange, with the proposed route of transit thereof, and its ■destination.”
*392 The second regulation prescribes that “ before the delivery of any license, the party therein permitted to trade shall execute a bond to the United States, with sufficient sureties, in the penal sum of at least twice the amount of the trade so licensed, which bond shall be subject to such approval, and conditioned on such terms as shall be specified in the license.”
Along with the promulgation of these regulations the Sec. ret ary of the Treasury gave notice that they were to remain in force so long as the condition of hostilities shall continue, unless sooner modified or revoked.
It would have been more satisfactory — it was indispensable — ■ to show in this bill that McDonald’s license was in strict conformity to these regulations.
Nowhere is there to be found, however, any regulation which authorized a license to purchase cotton in the South and bound the United States to protect such cotton from the dangers of war.
But the ground of McDonald’s claim against the United States was that he bought his cotton under a permit, and before he could get the cotton away under his permit, his license to trade and transport was revoked by act of Congress of 2d July, 1864.
It is a sufficient reply to that ground of claim to say that it was a time of war, when parties who ran risks sometimes made large profits and sometimes met with great losses. The permit in this case, if one was ever granted, was obtained on the express condition that it might be revoked at any time-McDonald, with eyes open, chose to take his permit on that condition. In one month, or perhaps two, after the cotton was purchased, the permit was revoked by the act of Congress of 2d July, 1864. I can see no ground for damages from that cause.
There is still another ground upon which, in my judgment, his claim against the United States was worthless. According to his statement the cotton was bought in the months of May and June, 1864, and not destroyed till February, 1865-At the time of its destruction, it is not even alleged that he was present himself, or had any agent or servant in charge of it, or that in any respect he exercised the slightest care for its protection, or thatnotice was given to General Orsborne., *393 or any officer of the force by which it was destroyed, of the existence of his license, if he had one.
If, indeed, the cotton was there and owned by him, it was not distinguishable from that of the enemy, and therefore subject to all the contingencies of war in a hostile country. Property so situated, and of that value, should have had the personal gua rdianship of its owner. If a license for its pro. tection existed, and had been shown to General Osborne, as in that case it ought to have been, the cotton would not have been destroyed. No military officer can violate a safe-con. duct, or lawful permit, except at his utmost peril.
But it is claimed that McDonald might have brought away the cotton, but for the passage of the act of July 2,1864. We have already seen that this was one of the risks which, after full notice, he chose to assume. Besides, the bill contains no averment that he made use of any diligence to bring it away either before or after the passa ge of that act until about the time it was destroyed, when it is stated he procured a special permit for that purpose from the Government here, but that before he could act under it the cotton was destroyed. But why should he care to incur the hazards of transportation in such a time, and in his circumstances. The license from this Government, had he shown it, would have been his sure protection, and he alleges that he had also obtained a sim ilar license from the confederate authorities» With the exercise of the commonest discretion, his cotton was safe from danger on either side. If his story be true, the cotton was lost by his own neglect, and his claim against the United States or General Osborne was indeed, as he. stated, utterly worthless. He knew this better than any one else, and marked it so in his schedule.
Under these circumstances, the worthless claim was sold by the assignee in bankruptcy and purchased by White for more than its value. It matters nothing whether White bought the claim on account of McDonald or for himself. Six months prior to that transaction McDonald had been discharged under the bankrupt proceedings, and thereafter had a perfect right to the proceeds of his own industry and enterprise, and to make his investments in what way he pleased. Concede that the sale to White was on his account; it shows *394 that he was not, at that time, looking forward to the treaty of 1871, under which the claim should be made valuable through the power of the British government. The claim derived all its value from that treaty. It was one of those chances which sometimes happen to create fortune for the recipient without merit or exertion on his part. In itself the claim was without value, but the British government took it up, and by paying equivalents to the United States, procured its allowance. And now the very assignee in bankruptcy who made the sale steps forward and asserts a claim to the fund in the face of his own acts, done with the sanction of his court, and which were all valid and regular at the time, for no other reason than that the property which was worthless when he sold it has turned out to be valuable in the hands of the purchaser from considerations which could not have been foreseen, and which were independent of its merits.
Lengthened as this opinion is already, I cannot bring it to a conclusion without adverting to another view of the ease, which, on the face of this bill, demands attention.
By the twelfth article of the treaty of 1871, it was provided that a commission should be chosen by the respective parties to the treaty, who should have the power to determine upon all claims which the respective governments should present on the part of their respective citizens against either of the governments of the character therein described. These •claims were to be prosecuted only by counsel appointed by the respective governments, and only on evidence so furnished. There was to be no, private interference. The contestation was to be between the one government and the •other only. And by the fifteenth article it was provided that “ all sums of money which may be awarded by the commissioners on account of any claim shall be paid by the one .government to the other, as the case may be, within twelve months after the date of the final award, with interest, and without any deduction save as specified in article XVI of this treaty.”
By the fourteenth article it was provided that these com-' missioners should be competent “to decide in each case whether any claim has or has not been duly made, preferred, *395 •and laid before them, either wholly, or to any and what extent, according to the true intent and meaning of the treaty.”
The money was to be paid over by the Government of the United States into the hands of the British government.
The object of this bill is to compel the defendants to make a written assignment or transfer’to the complainant of-the claim so held by McDonald against the British government under the award of the commissioners in his case.
There are at least two insuperable obstacles arising out of the treaty which, in our judgment, forbid our exercise of .jurisdiction in this matter. The first arises from the express language of the thirteenth article, which declares that “the ■high contracting parties hereby engage to consider the decision of the commissioners as absolutely final and conclusive upon each claim decided upon by them, and to give full effeet to such decisions, without any objection, evasion, or delay whatsoever.”
Concede the right of this complainant to the fund in controversy, the fund is in the hands of the British government for its administration, placed there in trust, to be disposed of under its contract to give full effect to such decisions.”
The British government is the tribunal created by the treaty itself to dispose of the money. With the manner of performing that duty neither this Government nor any of its •courts can interfere. The treaty determines that question.
The money is in England, and in the hands of that government, to be disposed of with no accountability to any other government or authority whatever. To exercise jurisdiction in such a case by this court would be vain and nugat >ry. The British government might respect our decisions, but that would be just as it pleased. Were we to decree •here that the money was the property of this complainant/ and that McDonald • should execute to him an assignment thereof, our decision would be simply nugatory.
In Story’s Equity Pleadings, section 489, the author says :•
“ In general, the fact that the property is not within the jurisdiction constitutes no bar to a proceeding in a court of equity, if the person is within the jurisdiction; for a court of equity acts upon the person, or, to use the appropriate phrase, cequit^s agit in personam. But questions may arise under a *396 bill respecting funds or other things in a foreign country so purely local that a court of equity in another country might very properly decline to interfere and remit it to the domestic forum.”
It is quite true that suits in equity were entertained in this court to determine fhe right to awards made by the commission which sat here under the treaty of Guadalupe Hidalgo, but that was where the fund was within the jurisdiction of the court, and a statute had expressly provided that such suits might be brought to determine rights as between citizens of the United States. It was also decided in Comegys vs. Vasse, 1 Pet., 193, that the commissioners under the treaty with Spain of 22d February, 1819, had power to decide upon the amount and validity of claims, but not upon the conflicting rights of parties to the sums awarded by them, which belonged to the courts.
But in that ease the controversy was between two citizens of the United States, and the fund was here, to be administered by this Government and paid to its own citizens. Suppose in that case that Gomegys, the assignee in bankruptcy, in whose favor the award was, had happened to be in Spain, and some citizen of Spain had there brought a suit against him, claiming the proceeds of the award, would anyone contend that such a proceeding could have been maintained in that country, or, if so, would have been respected in this. It would have been a sufficient answer to reply that by the terms of the treaty the awards made were to be for claims of American citizens against Spain, and that the American Government had undertaken to pay these awards through its own tribunals, executive or judicial. And yet that would have been a less objectionable proceeding than this one, for the terms of the Spanish treaty conferring jurisdiction over the subject on the American Government are not nearly so comprehensive and emphatic as those contained in the treaty of 1871, conferring jurisdiction upon the British government in respect of the awards in favor of its subjects.
These remarks are equally applicable to the case of Freval vs. Bach, (14 Pet., 95,) which was a controversy between American citizens as to the division of a sum of money re *397 ceived by the United States from the government of France under the treaty of July 4,1831.
Had some French citizen claimed a-right to this fund, and sought to enforce his claim by a decree obtained in a French court, in persanam, against an American who happened to be found in that country, it would have been a case like the present.
I cannot imagine that such a decree would have been respected by the Government of this country, to which the money had been paid with authority under the treaty to dispose of it among American claimants.
The fund in controversy in the present case is in England for all the purposes of this case, and, since its payment, has never been within the United States. From this proposition another question arises which has not yet been considered; and that is, whether the title to this fund could have passed to this assignee under the assignment in McDonald’s bankruptcy.
In England, the doctrine is that the bankrupt assignment transfers all the bankrupt’s personal property, wherever situated ; but such is not the law as held by the courts of this country. In Oakey vs. Bennet, 11 How., 33, it was held by the Supreme Court of the United States that a decree in bankruptcy, passed in 1843 by the district court of the United States for the eastern district of Louisiana, did not pass to the assignee real property in Texas, which at that time was a foreign country. In that case the court say, (McLean, J.:) “A statutable conveyance of property cannot strictly operate beyond the local jurisdiction. Any effect which may be given to it beyond this does not depend upon international law, but the principles of comity; and national comity does not require any government to give effect to such assignment when it shall impair the remedies or lessen the securities of its own citizens, And this is the prevailing doctrine in this country. A proceeding in rem against the property of a foreign bankrupt, under our local laws, may be maintained by creditors, notwithstanding the foreign assignment.”
The same views are to be found in Lawrence’s Wheaton, 2d ed., p. 162, where it is said that “All the effect which foreign laws can have in the territory of a State depends ab *398 solutely on the express or tacit consent of that State. A State is not obliged to allow the application of foreign laws-within its territory, but may absolutely refuse to give any effect to them.” And at page 163, the author quotes the following maxim from Huberus: “ By the comity of nations, whatever laws are carried into execution within the limits of any State are considered as having the same effect everywhere, so far as they do not oeeasion a prejudice to the rights of other States and their citizens.”
Our bankrupt law, therefore, and any proceedings under it,, can propose no extra territorial operation, except as permitted by the laws of other countries. Of itself, the assignment in bankruptcy transfers no title whatever even as to personal property whose situs is beyond the United States. Foreign: judicial tribunals, however, on the principle of comity, will give effect to such assignment whenever such action would not interfere with the rights of their own governments or subjects. In the case before us now, by the express terms of' the treaty, the exclusive administration of the fund has been committed to the British government. A Claim of jurisdiction on our part would be directly in conflict with that conferred by the treaty; the ground of comity is swept away;, the money is beyond our reach ; and this bankrupt assignment would be a nullity in England, because it is in conflict with the treaty, which is the law of that country, as it is of this.
It was on a similar principle that the lord chancellor in ex parte Blake, 1 Cox, 393, refused the petition of an assigneein bankruptcy to execute an assignment to him of claims-due to the bankrupt in America. In that case the lord chancellor said: “ My difficulty in making such an order as is now prayed against the bankrupt is this, namely, that, if he refuses I must commit him, and yet, in contemplation of our laws, the very instrument he is required to exe-, cute is of no effect.”
In Wharton’s Conflict of Laws, section 843, the law is thus-stated : “ That notwithstanding the attachment, (by which is meant the assignment in bankruptcy,) the bankrupt still retains his capacity to dispose of his property in foreign lands. This capacity remains to him as to such property- *399 until divested by the judex rei sitce. This point is abundantly settled by decisions both in Germany and France, as well as in the United States. But the domestic assignee, as the representative of the creditors in general, as well as foreign creditors specially, may apply, according to the modern Roman law, in foreign countries, where the estate has assets, for an attachment of such assets. In the practice of the United States courts, a foreign bankrupt assignee has, as-such, no standing in the courts, though, if there be no con flict with his assignor, or with creditors, he may be recognized as the representative of the assignor,” citing Perry vs. Barry, 1 Cr. C. C., 204; Blaine vs. Drummond, 1 Brock., 62; Hunt vs. Jackson, 5 Blatchf. C. C., 349.
A jurisdiction which depends on the comity of another nation cannot be jurisdiction, except in that country of which the comity is asked.
One other point still remains, and will be considered as. briefly as possible.
The only relief asked for in this bill, except injunction, (and that question is not now to be looked at,) is that these defendants be required and enjoined to assign and transfer-all their right to the fund to this complainant as assignee in bankruptcy.
On the complainant’s own showing, why should that be decreed? He says-it belongs to him under McDonald’s bankrupt assignment. If that be true, he needs no other assignment; he may assert his rights quite as well without the relief he asks as with it. Either way he must apply to the British government or the British courts. An assignment made under an order of this court would be an assignment in invitum, not a voluntary sale. It would have no effect, therefore, except such as it might derive under the doctrine of international comity. That much, and even more, this complainant already has under the assignment in bankruptcy. The English courts, it is well known, have gone further with the doctrine of comity in favor of the bankrupt proceedings of other countries than of any other class of foreign judgments or decrees.
But suppose we were to decree according to the prayer of this bill, and the defendant should refuse to obey our decree,. *400 we should then find ourselves in the position alluded to by the lord chancellor in Blake's case. We must commit him, and yet, in contemplation of our law, the very instrument he is required to execute is of no effect in itself, and might involve this Government in another controversy with Great Britain over the treaty of 1871.
These doctrines, we.think, are entirely consistent with the doctrine of Penn vs. Lord Baltimore, 1 Ves., 444; Massie vs. Watts, 6 Cr., 148, and other cases of the same purport, in which the courts have held that in case of fraud, of trust, or of contract, the jurisdiction of a court of chancery is sustainable wherever the person be found, although property not within the jurisdiction of that court may.be affected by the decree. For in the present case no fraud is charged in the bill, there is no trust, and there is no contract. The whole controversy is between two distinct claims of title to the property.
In Penn vs. Baltimore, the chancellor said:
“This court, therefore, has no original jurisdiction on the direct question of the original right of boundaries; ” and Chief-Justice Marshall, in Massie vs. Watts, adds, after quoting this opinion of the lord chancellor: “ The reason why it had no original jurisdiction on this direct question was that the decision on the extent of those grants, including •dominion and political power as well as property, was exclusively reserved to the king in council.” And in another place the chief-justice says: “The inquiry, therefore, will be whether this be an unmixed question of title or a case of fraud, trust, or contract.”
It is but justice to the learned counsel by whom this case was argued to say that our decision in this cause has been placed upon grounds which seemed most satisfactory to our minds, and that in doing so we do not wish to be understood as expressing an opinion one way or the other on those other numerous questions which were discussed on that occasion and not now passed upon, for the reason which has just been stated.
Cartter, Ch. J., and Olin, J., dissenting.